Argued and submitted February 16, affirmed November 16, 2005

Donald L. MOE, Jr.,
*Respondent,*

*v.*

EUGENE ZURBRUGG CONSTRUCTION CO.,
an Oregon corporation;
Park Lanes, Inc.,
an Oregon corporation; and
Park Lanes of Hillsboro, LLC,
an Oregon limited liability company,
*Appellants.*

0012-12966; A120140

123 P3d 338

Michael A. Lehner argued the cause for appellant Eugene Zurbrugg Construction Co. With him on the briefs was Lehner & Rodrigues PC.

Todd S. Baran argued the cause and filed the briefs for appellants Park Lanes, Inc. and Park Lanes of Hillsboro, LLC.

Robert K. Udziela argued the cause for respondent. With him on the briefs were Daniel C. Dziuba and Tichenor Dziuba & Coletti, LLP.

Before Edmonds, Presiding Judge, and Wollheim and Schuman,* Judges.

---

* Schuman, J., *vice* Ceniceros, S. J.

WOLLHEIM, J.

## WOLLHEIM, J.

Defendants appeal from a judgment in favor of plaintiff on his claims for negligence and for damages for personal injuries under the Employer's Liability Law (ELL), ORS 654.305 - 654.336. On appeal, defendants assign error to the trial court's denial of their motions for a directed verdict, the trial court's failure to give defendants' requested jury instructions, and the trial court's admission of expert testimony. We affirm.

The facts relevant to the disposition of the case are as follows: Defendant Park Lanes operated a bowling facility in Hillsboro, Oregon, on leased property. When the lease ended in 1998, Park Lanes purchased nearby property in order to relocate the facility. Park Lanes contracted with defendant Zurbrugg Construction Company to build the new facility, although Park Lanes planned to relocate and install the lanes itself. The contract between Park Lanes (the Owner) and Zurbrugg (the Contractor) specified, in part:

"**9.1**  The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless Contract Documents give other specific instructions concerning these matters.

"* * * * *

"**9.7**  The Contractor shall be responsible to the Owner for the acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons performing portions of the Work under a contract with the Contractor.

"* * * * *

"**16.1**  The Contractor shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the performance of the Contract. The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

".1 employees on the Work and other persons who may be affected thereby;

".2 the Work and materials and equipment to be incorporated therein; and

".3 other property at the site or adjacent thereto.

"The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons and property and their protection from damage, injury or loss."

Zurbrugg subcontracted the interior walls, sheet rock, and acoustic tile ceilings to Cascade Acoustics Company, plaintiff's employer. The written contract between Zurbrugg and Cascade did not contain any language regarding Cascade's responsibility for safety. Cascade did have a safety plan, which specified that "100% Fall Protection shall be provided at all times when an employee is exposed to a fall distance of 6 feet or greater" and "[f]loor openings shall be guarded with guard rails or covered with a substantial cover." Cascade also had a fall protection plan that specified, in part:

"A.  Floor Openings & HVAC or Elec. Cutouts.

"1. No Cascade employees allowed in any area until General Contractor has installed proper Guardrail System and covered all interior floor penetrations."

Installation of the bowling alleys was a time-consuming and complicated process that required each lane, split into four sections weighing several thousand pounds, to be correctly positioned and leveled to within 40/1000th of an inch, and took four to six months to complete. Before the lanes were brought in, other Zurbrugg subcontractors installed electrical wiring, heating ducts, and sprinklers throughout the ceiling. Cascade employees also hung a metal ceiling grid from the roof, in which the acoustic ceiling tile was to be placed. Work on the lanes started before the ceiling was completed. Gary Zurbrugg, the project manager, testified that, because the custom-made heating units for the building were not ready, a decision was made to wait to install the ceiling tile, which was subject to warping.

All work up to this point was done from a flat concrete surface, using scissor-lift scaffolds. After Park Lanes began to install the bowling lanes, the floor became much more hazardous. Between each lane was a trench that was left open so that Park Lanes workers could level the lanes, work on the ball return tracks and the wiring, and lay sheetrock. Park Lanes did not cover the holes, and workers sometimes stepped into the holes. Plaintiff presented testimony that Gary Zurbrugg considered the area a general area and had stated that he was not going to cover the holes because it was up to each individual contractor, although he provided pieces of plywood so that workers could cover a trench while they worked above it.

On the day prior to plaintiff's injury, and about a month after work on the lanes began, two Cascade employees were told to install the ceiling tiles. Dale Dodge, Cascade's on-site supervisor, testified that Zurbrugg did not specify the exact date to install the tiles, but that they were to be installed "within a few days" of the order. The workers used Baker's scaffolds—framed scaffolds mounted on wheels—to straddle a trench, with the wheels on the two lanes on each side of the trench. The workers would drop in ceiling tile and then pull themselves down the lanes by holding on to the metal ceiling grid. Several witnesses testified that this method was commonly used in the industry. Witnesses also testified that other types of scaffolds, such as a scissor-lift, would either be unsafe to use or were not available. The next day, plaintiff, who had been hanging sheetrock at the site, was asked to help with the installation. At some point during the work, one of the wheels on plaintiff's Baker's scaffold fell into a trench, causing it to flip and send plaintiff to the ground. As a result of the fall, plaintiff suffered severe injuries.

In his first amended complaint, plaintiff brought two claims for relief. The first claim was under the ELL and the second claim was based on negligence. The first claim was divided into three "counts," in that it alleged that defendants had violated the ELL (1) based on safety codes, (2) not based

on safety codes, and (3) based on the Oregon Safe Employment Act (OSEA),[1] ORS 654.001 - 654.295, ORS 654.750 - 654.780; ORS 654.991. Plaintiff alleged, among other things, that defendants had violated the ELL by permitting the installation of the lanes before the overhead work had been completed, failing to cover the trenches or to require that another employee be assigned to prevent the scaffold from falling into the trenches, and failing to properly instruct workers in the recognition and avoidance of unsafe and hazardous conditions. The negligence claim alleged that defendants were negligent in the same ways as under the ELL claim.

The jury found in favor of plaintiff and against Zurbrugg on both claims for relief. Using a special verdict form, the jury answered "Yes" to each of the three counts on the ELL claim. The jury found in favor of plaintiff and against Park Lanes on the first two ELL counts, but against plaintiff on the third count, the OSEA count, and the negligence claim. The jury found Zurbrugg 51 percent at fault, Park Lanes 10 percent at fault, and plaintiff 39 percent at fault.

On appeal, Zurbrugg argues that the trial court erred in denying its motion for a directed verdict as to plaintiff's ELL and negligence claims; in improperly instructing the jury on plaintiff's third ELL count because the OSEA does not apply to indirect employers; in allowing plaintiff's expert to testify regarding the legal effect of the contract between Zurbrugg and Park Lanes; and in refusing to give Zurbrugg's requested jury instructions. Park Lanes argues that the trial court erred in denying Park Lanes's motion for a directed verdict on the ELL claims because it was not plaintiff's indirect employer; in denying its motion for a partial directed verdict on plaintiff's allegation that it violated OAR 437-003-0905, because the bowling lanes did not constitute a floor under that administrative rule; and in refusing to give

---

[1] The three "counts" had been separately stated as three claims for relief in plaintiff's original complaint. On defendants' motions, the trial court ordered that they be stricken as separate claims for relief, but allowed plaintiff to combine them as separate "counts" of the ELL claim in the first amended complaint.

Zurbrugg's requested jury instructions. We address each defendant's arguments in turn.

■　　Zurbrugg first assigns error to the trial court's denial of its motion for a directed verdict as to the ELL claim. Zurbrugg argues that plaintiff failed to prove that it was liable under any of the three tests articulated in *Wilson v. P.G.E. Company*, 252 Or 385, 391-92, 448 P2d 562 (1968). We note at the outset that

> "[t]his court reviews the denial of a motion for a directed verdict for any evidence to support the verdict in plaintiff's favor. * * * This court cannot set aside a jury's verdict unless there was no evidence from which the jury could have found the facts necessary to establish the elements of plaintiff's cause of action. * * * Instead of weighing the evidence, this court must consider the evidence and inferences therefrom in the light most favorable to plaintiff."

*Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 159, 61 P3d 918 (2003).

■　　In *Woodbury*, the Supreme Court noted that the ELL imposes a "heightened statutory standard of care on a person or entity who either is in charge of, or responsible for, any work involving risk or danger." *Id.* ORS 654.305 states that,

> "[g]enerally, all owners, contractors or subcontractors and other persons having charge of, or responsibility for, any work involving a risk or danger to the employees or the public shall use every device, care and precaution that is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices."

For liability to be imposed, the person or entity must (1) be engaged with the plaintiff's direct employer in a common enterprise; (2) retain the right to control the manner or method in which the risk-producing activity was performed; or (3) actually control the manner or method in which the risk-producing activity is performed. *Wilson*, 252 Or at 391-92.

In *Woodbury*, the defendant, a general contractor, had ordered the plaintiff's direct employer, a subcontractor, to hang a water pipe over a sunken stairway and corridor. 335 Or at 157. The defendant told the subcontractor where to locate the pipe and what kind of materials to use, and one of the defendant's employees, Griffin, discussed with the sub-contractor's owner, Flaherty, how to suspend the pipe. *Id.* at 157-58. The two men decided to build a wooden platform over the stairway and corridor, although the details of how to construct the platform were left to Flaherty. *Id.* at 158. The plaintiff and Flaherty then built the platform without any further input or oversight from any of the defendant's employees. *Id.* After the pipe work was finished, the plaintiff attempted to dismantle the platform by himself and was seriously injured when he lost his balance and fell into the corridor. *Id.* The plaintiff filed an ELL claim asserting that the defendant had failed to install guardrails on the platform and to train the plaintiff how to avoid the hazards of working in areas where there was a danger of falling. *Id.* He conceded that the defendant and his direct employer were not engaged in a common enterprise, but argued that the defendant retained the right to control, or actually controlled, the manner or method in which the risk-producing activity was performed. *Id.* at 160, 160 n 4. The plaintiff also filed a common-law negligence claim, alleging that the defendant was negligent for failing to provide proper training and supervision for the disassembly of the platform. *Id.* at 158.

Using the statutory analysis framework outlined in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), the Supreme Court defined risk-producing activity broadly and stated that, to identify the relevant scope of the work for purposes of the ELL, the court must first determine whether the work involved a risk or danger to the employees or the public. *Woodbury*, 335 Or at 161. "Risk or danger" refers to conditions of the work that create the possibility that a worker will suffer harm. *Id.* The court found that, while moving the boards, the plaintiff was working at a dangerous height over a concrete surface, and that that height created a constant risk of harm to the employees working on that section of the pipeline. *Id.* The court stated:

"[d]uring that part of the project, the risk was reduced by building a platform on which plaintiff could stand while installing that section of the pipeline. The work included both the assembly and disassembly of the platform. The height of the work posed a risk of injury to the employees while the platform was assembled, while it was used to complete the project, and while it was disassembled. The risk of falling, then, was the most obvious potential and foreseeable danger during the installation of that section of the pipeline. We conclude that, under these facts, the 'work involving a risk or danger' included requiring plaintiff to work at height during the assembly, use, and disassembly of the platform."

*Id.* at 161-62. The court found that, under the facts presented, there was evidence from which the jury reasonably could conclude that the defendant exercised actual control both over the decision to use a wooden platform and over the choice of how that platform was constructed, particularly that the platform was constructed "without fall protection that might have protected plaintiff from injury." *Id.* at 163.

■       In this case, then, to determine whether any of the work involved a risk or danger, we must first determine the conditions of the work that created the possibility that a worker would suffer harm. While installing the ceiling tile, plaintiff was working on a scaffold over an uneven surface with open trenches. The trenches posed a risk of injury to the employees working on the project, and workers had stepped into the trenches. The risk of injury could have been reduced by covering the trenches. The risk of tripping or falling into the trenches was the most obvious potential and foreseeable danger during the installation of the ceiling tiles. We therefore conclude that the "work involving a risk or danger" included requiring plaintiff to work above open trenches during installation of the ceiling tiles.

Once the scope of the work involving a risk or danger is defined, evidence of Zurbrugg's retained control is sufficient to sustain the jury's verdict on the ELL claim. The contract between Zurbrugg and Park Lanes required Zurbrugg to take responsibility for safety on the project and to follow all applicable safety laws, and specified that Zurbrugg was

"solely responsible" for, and had control over, the construction "means, methods, techniques, sequences and procedures and for coordinating all portions of Work under the Contract." Cascade's own fall protection plan, which had been provided to Zurbrugg, stated that the General Contractor was responsible for covering holes in the floor. Plaintiff presented evidence that Gary Zurbrugg was at the work site nearly every day, was aware of the risk, and had been asked to cover the trenches and refused. There was also evidence that Zurbrugg had provided sheets of plywood to some workers to cover the trenches above which they were working. Plaintiff presented evidence that Zurbrugg had control over the sequencing of the entire project, and that Park Lanes and Zurbrugg decided when to install the bowling lanes. The ceiling work was nearly completed before work on the lanes began, but Zurbrugg decided that the ceiling tiles should not be installed until the heaters were ready. Zurbrugg made the decision as to when Cascade was to install the ceiling tiles. Because of the condition of the floor, options as to how to install the ceiling tile were limited. There was testimony that there was a "rush" to get the ceiling finished and that the work could have waited until the gutters were installed.

■       In light of those facts, there was evidence from which the jury reasonably could conclude that Zurbrugg retained the right to control the manner or method in which the risk-producing activity was performed and exercised actual control over the work, and, therefore, Zurbrugg was liable under the ELL. Therefore, we need not examine whether Zurbrugg was engaged in a common enterprise with plaintiff's employer. The trial court correctly denied Zurbrugg's motion for a directed verdict.

Zurbrugg next assigns error to the trial court's denial of its motion for a directed verdict as to plaintiff's negligence claim. Zurbrugg argues that it had no common-law duty to protect plaintiff from his own negligence or the negligence of his direct employer, and that plaintiff failed to show that Zurbrugg had some measure of control over the work performed by plaintiff when he was injured. Zurbrugg argues that, under *Boothby v. D.R. Johnson Lumber Co.*, 184 Or App 138, 155, 55 P3d 1113 (2002), *rev allowed*, 336 Or 376

(2004), one who hires an independent contractor with specialized skill and expertise cannot be held liable to the employees of that contractor for hazards normally attendant on work for which the contractor was hired and for which the hiring party has no responsibility or involvement.

■ As with the ELL claim, this court cannot overturn the jury's verdict unless there is no evidence from which the jury could have found the facts necessary to establish the elements of plaintiff's claim. *Woodbury*, 335 Or at 163. Plaintiff's negligence claim makes the same allegations as in the ELL claim, including failure to initiate, maintain, and supervise all safety precautions and programs in connection with the work, failing to conduct a proper inspection of the work being done on the job site, and allowing the ceiling tile work to go forward on scaffolds in proximity to the trenches. As previously noted, there was evidence permitting the jury to find that Zurbrugg exercised actual control over the safety of the entire project and was an integral participant in the project. In *Boothby*, there was no evidence that the defendant exercised actual control over the project. Here, by contrast, there is evidence of actual control by defendants. A jury reasonably could find that, by setting the schedule of work and ordering the ceiling tile work to be done when it did, Zurbrugg was a substantial factor in causing plaintiff's injury. The trial court correctly denied Zurbrugg's motion for a directed verdict on plaintiff's negligence claim.

■ Zurbrugg next argues that the trial court erred when it improperly instructed the jury on plaintiff's third ELL count, because the OSEA does not apply to indirect employers. We do not reach the merits of that claim, however, because, under ORS 19.415(2), "[n]o judgment shall be reversed or modified except for error substantially affecting the rights of a party." In *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 176, 61 P3d 928 (2003), the court abandoned its "we can't tell" rule, which it had adopted in *Whinston v. Kaiser Foundation Hospital*, 309 Or 350, 788 P2d 428 (1990). In its place the court adopted a new rule:

> "[W]e hold today that appellate courts, to act within statutory limitations, may not apply the 'we can't tell' rule to

order a new trial in a case involving a judgment on a general verdict based on multiple specifications, one of which is invalid, if there is evidence to support another, valid specification."

*Shoup*, 335 Or at 176. Here, there was a special verdict and the jury found Zurbrugg liable under all three counts of the ELL claim. Because the jury found against Zurbrugg under the first and second ELL counts, and Zurbrugg, in this assignment of error, challenges only the third count, under ORS 19.415(2) and *Shoup* we need not reach the merits of Zurbrugg's assignment because, even if Zurbrugg was correct, any error did not substantially affect its rights.

In its fourth assignment of error, Zurbrugg claims that the trial court erred when it overruled Zurbrugg's objection to testimony by plaintiff's expert witness regarding his "legal interpretation" of the contract between Zurbrugg and Park Lanes. Zurbrugg contends that there was no dispute as to the content of the contract and that it was error to allow the expert to testify that the "contract has an effect contrary to that suggested by Oregon case law." Zurbrugg argues that the trial court should have found as a matter of law that the contract did not establish Zurbrugg's right to control plaintiff's work. Plaintiff responds that he specifically limited the expert's testimony to custom and practice in the industry, and precluded any opinion on the legal effects of the contract. Plaintiff also argues that other witnesses, including Gary Zurbrugg, testified to the meaning of the contract without objection.

OEC 103(1) provides, in part, that "[e]vidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]" *See Kahn v. Pony Express Courier Corp.*, 173 Or App 127, 154, 20 P3d 837 (2001), *rev den*, 332 Or 518 (2001). We agree with plaintiff that the error, if any, was harmless. Here, the expert was specifically prohibited by plaintiff from giving a legal opinion. The expert testified regarding his experience as to how contracts are handled within the construction industry, and that the contract between Park Lanes and Zurbrugg was a standard form contract, which stated that the general contractor

was responsible for safety on the project. Gary Zurbrugg testified without objection that the contract required him to be responsible for all safety on the project. Another witness, a former OSHA inspector, also testified without objection that the contract placed responsibility for safety on Zurbrugg. Therefore, even assuming that it was error for the trial court to have admitted the expert's testimony, the jury heard the same evidence from other witnesses without objection. The error, if any, was harmless.

■■ Finally, Zurbrugg assigns error to the trial court's refusal to give four requested jury instructions.[2] A party is entitled to jury instructions on his or her theory of the case if the instructions correctly state the law and are based on the pleadings and proof. *Roop v. Parker Northwest Paving Co.*, 194 Or App 219, 251, 94 P3d 885 (2004), *rev den*, 338 Or 374 (2005). There is no error, however, if the requested instruction is not correct in all respects; if, although the requested instruction is correct, its substance was covered fully by other instructions; or if the requested instruction is not necessary in order to explain the particular issue or point of law to the jury. *Id.* Error in failing to give a requested instruction requires reversal only if the jury instructions given by the trial court, considered as a whole, caused prejudice to the party requesting the instruction. *Id.* at 252; *see also, e.g., Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 703, 64 P3d 1193, *adh'd to as clarified*, 187 Or App 472, 68 P3d 259 (2003).

The two sets of instructions were sufficiently similar that Zurbrugg was not prejudiced by using the uniform jury instructions. For example, Zurbrugg's proposed jury instruction number 28 included the phrase "commingling of the activities of [the subcontractor] and either Zurbrugg or Park Lanes." The instruction that the trial court gave stated that defendants and plaintiff's employer had to be "simultaneously in work on a common enterprise." As plaintiff points out, the two jury instructions are substantially similar. Zurbrugg's proposed jury instruction 29 included the phrase "the control, if any, * * * defendants had over the work site must have created the danger that resulted in plaintiff's

---

[2] Defendant Park Lanes joins in this assignment of error.

injury." The instruction that the trial court gave stated that "plaintiff must prove that defendant had control over the work that caused the injury to plaintiff." Again, the two instructions are substantially similar.

The last two of Zurbrugg's proposed jury instructions defined the work involving a risk or danger as installing the ceiling tiles. That is not an accurate statement because the work involving a risk or danger was requiring plaintiff to work above open trenches while installing the ceiling tiles. For those reasons, there was no error in refusing to submit Zurbrugg's proposed instructions to the jury.

We now turn to Park Lanes's separate assignments of error. Park Lanes first argues that the trial court erred in denying its motion for a directed verdict as to plaintiff's ELL claim, because plaintiff failed to prove that it retained sufficient control or exercised actual control over plaintiff's work, or was engaged in a common enterprise with plaintiff's employer.

■■■ Park Lanes faces the same standard for reversal as did Zurbrugg: we review the denial of a motion for a directed verdict for any evidence to support the verdict in plaintiff's favor. *Woodbury*, 335 Or at 159. We first consider common enterprise liability, which requires that an employer "do more than have its own employees working with plaintiff toward the furtherance of a common enterprise." *Brown v. Boise-Cascade Corp.*, 150 Or App 391, 396, 946 P2d 324 (1997), *rev den*, 327 Or 317 (1998). Rather, the defendant must exercise "control or charge over the activity or instrumentality that causes the injury[.]" *Id.* To trigger liability, there must be a causal link between the defendant's involvement in joint work and the plaintiff's injury. *Id.* at 397. Park Lanes argues that there was no common enterprise because plaintiff was not injured by an active operation of, or equipment supplied by, Park Lanes, and that there is no evidence that it was engaged in active operations at the time of plaintiff's injury. To the contrary, plaintiff was injured because he was working above lanes with trenches that were left open specifically to allow Park Lanes employees to level the lanes, work on ball returns, and install sheetrock. Evidence presented at trial showed that Park Lanes employees were

engaged in work on the bowling lanes every day. In light of those facts, there was evidence from which the jury reasonably could conclude that Park Lanes was engaged in a common enterprise with plaintiff's employer and, therefore, was liable under the ELL. Therefore, we need not determine whether Park Lanes retained control or exercised actual control over the work.

■ Park Lanes next assigns error to the trial court's denial of its motion for a partial directed verdict on paragraph 16(a) of plaintiff's complaint, which alleged that Park Lanes violated OAR 437-003-0905. That provision provides:

> "In buildings or other structures of wood floor construction, the under-flooring shall be laid on each tier of joists as the structure progresses, or if double floors are not to be used, the tier of joists next below where work is being performed shall be entirely floored over except for such spaces as are required for ladders and shaftways."

Park Lanes argues that the evidence failed to establish that the bowling lanes that plaintiff was working above constituted a wood floor within the meaning of the rule. Instead, Park Lanes argues that the "floor" is the concrete pad and that the bowling alleys are alleys, not floors. Under the statutory construction analysis required by *PGE*, 317 Or at 610-12 n 4, we examine the language of the rule in context and, if necessary, its history and other aids to construction. At the first level of analysis, we construe words of common usage by giving them their plain, natural, and ordinary meaning. "Floor" is defined, in part, as "the bottom or lower part of any room : the part of a room upon which one stands." *Webster's Third New Int'l Dictionary* 873 (unabridged ed 2002). Though one is generally discouraged from walking on waxed bowling alleys, it seems clear that, if one had to, one would walk on the alley, not the concrete below. The bowling alley is a floor. The trial court did not err in denying Park Lanes's motion for a partial directed verdict.

Park Lanes joins Zurbrugg's fifth assignment of error concerning proposed jury instructions, and we reject it for the reasons stated above.

Affirmed.